**SO ORDERED.**

**SIGNED this 14 day of June, 2018.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                              CASE NO. 18-00630-5-DMW

CHL, LLC
                    DEBTOR                          CHAPTER 11

## ORDER DENYING FINAL APPROVAL OF DISCLOSURE STATEMENT

This matter comes on to be heard upon the court's consideration of the Disclosure Statement filed by CHL, LLC ("Debtor") on March 28, 2018, the Objection to Debtor's Disclosure Statement and First Amended Plan of Reorganization filed by Private Capital Group, Inc. ("PCG")[1] on May 17, 2018 and the Bankruptcy Administrator's Statement Regarding the Adequacy of the Debtor's Disclosure Statement and Confirmation of the Debtor's Plan of Reorganization filed by the United States Bankruptcy Administrator ("BA") on May 17, 2018. The court conducted a hearing in Raleigh, North Carolina on May 24, 2018.  Trawick H. Stubbs, Jr., Esq. and Laurie B. Biggs, Esq. appeared for the Debtor, James Oliver Carter, Esq. and Paul A.

---

[1] In its Objection, PCG states it "is servicer for, and the agent of, 26 separate Lenders. Approximately 12 of the Lenders are Individual Retirement Accounts . . . ; others are individuals and living trusts established by individuals; several are limited liability companies. PCG is authorized, as servicer for the Lenders, to represent them in this bankruptcy case and take such action as PCG deems necessary to protect the interest of the lenders."

Fanning, Esq. appeared for PCG, and Brian C. Behr, Esq. appeared for the BA.  Based upon the pleadings, the arguments of counsel and the case record, the court makes the following findings of fact and conclusions of law:

1.      This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.  The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2.      The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on February 9, 2018.  Ernest Woodrow Davis, Jr. ("Mr. Davis") is the sole member of the Debtor.  The Debtor owns real property ("Property") in the Wilmington, North Carolina area which it plans to continue developing in seven phases within a subdivision known as Scotts Hill Village.  The Property comprises 52 developed lots and 57 acres of undeveloped land.

3.      The Debtor filed the Disclosure Statement in conjunction with a Chapter 11 Plan of Reorganization.  The court entered an Order on March 29, 2018 conditionally approving the Disclosure Statement and setting May 17, 2018 as the deadline for filing an objection to the Disclosure Statement.  PCG and the BA timely filed their objections to the Disclosure Statement. The Debtor filed an Amended Plan on April 18, 2018 and a Second Amended Plan on May 23, 2018, the day before the hearing.

4.      PCG asserts the court should withdraw the conditional approval of the Disclosure Statement, because the Disclosure Statement does not contain adequate information, and the Debtor has not proposed a confirmable plan of reorganization.

5.      Pursuant to 11 U.S.C. § 1125(b), a Chapter 11 debtor may not solicit acceptance of its plan of reorganization

> from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

> '[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).  A court cannot issue final approval of a disclosure statement without finding that the statement contains adequate information under the circumstances of the case. *See Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 696 (4th Cir. 1989) ("The determination of whether the disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court." (citation omitted)).

<u>Inadequate Information</u>

6.      The Disclosure Statement explains the current status of the seven phases of development of the Property and forecasts the Debtor's plan to sell lots to Level Carolina Homes, LLC ("LCH"), a residential builder.[2]  The Debtor initially plans to sell 52 lots in Phases 1 and 2 to LCH for $85,000.00 each, for a total of $4,420,000.00.  A construction budget attached as an exhibit to the Disclosure Statement states that those phases are 100% complete, but the Debtor is responsible under the contract with LCH for preparing the lots for a sewer connection.  Phases 1 and 2 are far from being completed.  The Disclosure Statement also states that the Debtor's contract

---

[2] George F. Sanderson, III, Esq. was present at the hearing on behalf of LCH, because matters involving LCH were scheduled to be heard on May 24, 2018; however, those matters were not heard in light of the court's finding that the Disclosure Statement should not be approved.

with LCH requires the Debtor to meet certain development benchmarks, including the completion of an amenity center located within Phase 7 of the subdivision, within twelve months of the sale. A site plan is attached to the Disclosure Statement as an exhibit, but the delineation of the phase locations is unclear due to the small scale of the site plan.  The amenity center construction will cost, according to the Debtor, $450,000.00 plus $400,000.00 in development work to create access to the amenity center from the 52 lots.  Exhibit E attached to the Disclosure Statement states that the amenity center and sewer-related funds will be paid from the sale of the 52 lots before "net proceeds after development costs" will be paid to PCG and other creditors.  Also included in the development costs to be withheld from creditor distribution is a "Construction Reserve" in the amount of $500,000.00 "which will be used for any change orders, increases in material prices, contingencies, or unexpected costs."  A line item of this amount demands more explanation.[3]

7.    The Debtor's contract with LCH[4] contemplates the future purchase by LCH[4] of the lots in Phases 3 through 7, once those lots have been developed pursuant to certain specifications required by LCH.  Pursuant to the information provided in the Disclosure Statement, LCH will play an integral role in the Debtor's reorganization efforts, and the Debtor will expend significant funds after the initial sale of the 52 lots to prepare the later phases for purchase by LCH.  "Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face." *In re RADCO Props., Inc.*, 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) (citing *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.)*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997), *aff'd without opinion* 163 F.3d 598

---

[3] The Second Amended Plan reduces the Construction Reserve amount to $100,000.00; however, this reduction does not excuse the Debtor from explaining the purpose of the proposed Construction Reserve more clearly in the Disclosure Statement.
[4] The Debtor's contract with LCH initially included an option for LCH to purchase subsequent phases of development, but at the hearing on May 24, 2018, counsel for LCH stated that LCH is willing to commit to purchasing lots developed in Phases 3 through 7, rather than merely reserving an option to purchase.

(4th Cir. 1998)).  The Plan relies extensively upon the Debtor's relationship with LCH and LCH's ability to perform under the proposed contract.  The Disclosure Statement should have provided information about LCH in the following areas: its history as a residential builder; other similar projects; its ownership; its licensing; any pending legal action; its prior relationship with the Debtor and its principals; and its capitalization.

8.     The Disclosure Statement explains that before the Debtor filed its petition, PCG initiated foreclosure proceedings on the Property and submitted the high bid in the amount of $8,000,000.00.  The Debtor filed its petition during the ten-day upset bid period.  The Debtor values the Property at $8,000,000.00 in the Disclosure Statement for purposes of its liquidation analysis, presumably based on PCG's bid at the foreclosure sale.  PCG asserts a total claim against the Debtor in the amount of $19,100,331.18.   Although the Debtor conveniently used the foreclosure bid as the Property valuation, the Debtor has failed to provide any other estimate of value from any other source.  This court is keenly aware of the difference between liquidation value and going concern value, as recognized by the Honorable Malcolm J. Howard in *Gateway Bank & Trust Co. v. Clarendon Holdings, LLC* (*In re Clarendon Holdings, LLC*), No. 7:11-CV-247-H, 2013 U.S. Dist. LEXIS 189288, 2013 WL 8635348 (E.D.N.C. 2013).  Certainly, PCG would not use a going concern value in its bid at a liquidation through a foreclosure sale.  It has been this court's experience that a lender would discount its bid by as much as twenty percent from the fair market value at a foreclosure sale in order to account for disposition costs and the time-value of money associated with holding an asset until liquidation.  Under the circumstances of this case, the Disclosure Statement must provide a clearer explanation of why the Debtor asserts the Property is worth $8,000,000.00 in its current condition.

9.      The Disclosure Statement explains the projected closing costs associated with the sale of the Debtor's lots to LCH, including a 4% fee to the Debtor "for general administrative costs of continuing to manage the subdivision and its development" and a 6% commission to JEF Management, LLC ("JEF") for brokerage fees.  The Disclosure Statement does not elaborate on the management services the Debtor will be performing to warrant those fees.  As discussed in more detail below, Mr. Davis intends to retain his 100% interest in the Debtor, so management fees paid to the Debtor would presumably go to Mr. Davis.  JEF has not been employed as a professional in this case, and the Debtor did not schedule JEF as having a pre-petition claim or executory contract for broker-related work performed, or to be performed, for the Debtor.[5]  The Disclosure Statement provides little guidance of the anticipated 6% commission to JEF for the sale of the 52 lots.  According to the BA,[6] JEF shares the same principle office address as Mr. Davis.  JEF's registered agent and managing member is JoAnne Fox ("Ms. Fox"), and the BA asserts Ms. Fox may qualify as an insider of the Debtor due to her close relationship with Mr. Davis.  The Disclosure Statement does not contain any information about JEF and its relationship to the Debtor.  JEF, and potentially Ms. Fox, would earn over $265,000.00 in commissions from the initial sale of 52 lots to LCH under the terms specified in the Disclosure Statement.  If the assertions made by the BA have any merit, the Debtor should have included additional information about JEF and Ms. Fox in its Disclosure Statement.  Regardless, the Debtor has been far from transparent in its anticipated operations under the Plan.

10.      The Second Amended Plan, in an exhibit entitled "Projections of Income and Expenses," removes the broker commissions from the projected closing costs of the initial sale to

---

[5] The Debtor scheduled JEF as an unsecured creditor with a claim in the amount of $35,834.23 for "loans."

[6] This information is contained in the BA's April 23, 2018 objection to the Debtor's Motion To Sell Property Free and Clear of Liens and Other Interests, With Liens to Attach to Proceeds Pursuant to 11 U.S.C. § 363(f) and Motion for Approval of Private Sale.

LCH and inexplicably increases the "developer admin fee" from 4% to 7.5%. Article V of the Second Amended Plan, however, continues to provide for a 6% commission to JEF and a 4% "administrative" fee to the Debtor from each closing. Assuming the Debtor intends to pay the amounts proposed in the exhibit, rather than the amounts described in detail in Article V, that overall reduction does not relieve the Debtor from proper and adequate disclosure. Creditors must receive all information about the Debtor's services relating to "manag[ing] the subdivision and its development" to warrant as much as $331,500.00 upon the sale of 52 lots to LCH. For the reasons set forth above, the court finds that the Disclosure Statement does not contain adequate information in light of the circumstances of this case.

<u>Unconfirmable Plan</u>

11.     The court also is restricted from approving a disclosure statement if the associated plan of reorganization cannot be confirmed. As stated by the United States Bankruptcy Court for the Eastern District of Virginia, "[i]f the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). This determination prevents the parties from undergoing a costly confirmation process that will not be successful based on the proposed terms of a plan.

*Absolute Priority Rule*

12.     The Second Amended Plan does not propose to pay creditors in full but advises that Mr. Davis will retain his membership interest in the Debtor. The Second Amended Plan does not propose any infusion of capital by Mr. Davis in exchange for his continued equity interest in the Debtor. On its face, the Second Amended Plan is not confirmable because it is not fair and equitable pursuant to 11 U.S.C. § 1129(b)(2)(B)(ii). Consequently, the Disclosure Statement

should not be approved. *See Pecht*, 57 B.R. at 139 ("[S]hould the contents of the disclosure or the

plan reflect an inability to comply with those requirements [of § 1129], the Court may decline

approval of the disclosure statement."). If the Debtor does not file a further amended plan, then,

at a minimum, an amended disclosure statement should propose what "new value" Mr. Davis will

be offering for his continued equity interest as sole member-manager of the Debtor after

confirmation.

*Liquidation Procedure*

13.     The Second Amended Plan also proposes the sale of the Property (in phases) free

and clear of PCG's lien[7] without providing PCG with the option to credit bid for the Property.

Citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644, 132 S. Ct. 2065,

2070, 182 L. Ed. 2d 967, 973 (2012), PCG asserts the sale as proposed within the Second Amended

Plan fails to comply with 11 U.S.C. § 1129(b)(2)(A) and is not fair and equitable. Section

1129(b)(2)(A)(ii) allows the sale, through a Chapter 11 plan, of property free and clear of liens,

subject to the provisions of 11 U.S.C. § 363(k). Section 363(k), in turn, requires that a lienholder

be permitted to credit bid at a sale free and clear of liens, "unless the court for cause orders

otherwise." 11 U.S.C. § 363(k). At a confirmation hearing, the Debtor may be able to establish

grounds for the court to deny PCG's right to credit bid. It would be premature to find that the

Second Amended Plan cannot be confirmed due to the absence of a credit bid provision in the

Debtor's contract with LCH; however, the court notes that if the Debtor ultimately intends to

preclude PCG from credit bidding against LCH, the Debtor will need to provide more robust

---

[7] The Second Amended Plan states that "PCG shall retain all of its liens, with the priority thereof, as existed on the Petition Date pursuant to § 1129(b)(2)(A)(i)(I) of the Bankruptcy Code, until the Reorganized Note is paid as outlined herein," but subsequently states "[n]otwithstanding the forgoing, PCG's lien shall not attach to any real estate or lots sold pursuant to the terms of this Plan or any Order authorizing the sale of such lots free and clear of liens, after the date of such sale."

8

information about its valuation of the Property and about LCH as a viable purchaser of the various phases of sale.

*Classification*

14.    The Second Amended Plan identifies eleven different classes of claims against the Debtor.  The Second Amended Plan bifurcates PCG's claim into a secured claim in the amount of $8,000,000.00 based on the asserted value of the Property and an unsecured deficiency claim for the balance owed to PCG.[8]  The Second Amended Plan proposes to pay $245,000.00 to PCG on its deficiency claim, plus "one half of the balance of the net cash from the sale of lots, after payment of all development expenses and other payments provided for by the Plan."  Tribute Construction, Inc. and Dominion Land Corporation, creditors under a promissory note and deed of trust executed by the Debtor, are grouped in Class 5 of the Second Amended Plan.  The Second Amended Plan states that "as there is no equity in the collateral to secure [the] lien," the obligation will be treated as a general unsecured claim; however, the plan treats these creditors as a separate class for voting purposes.  PCG asserts the Debtor created separate classes for various unsecured creditors in an effort to eliminate PCG's voting leverage, and the Debtor's classifications warrant the court's rejection of the Second Amended Plan.  The allegations by PCG cause the court concern; however, the court will not make a determination at this time whether the Debtor has properly and permissibly classified its creditors.  That determination should be made at a confirmation hearing when the Debtor has the opportunity to explain the different classes within its plan of reorganization.

---

[8] The Second Amended Plan states "PCG has asserted an outstanding balance owed on the loan of $17,000,000.00, after accounting for default interest, fees, and other charges to the loan, which is disputed by the Debtor."

15.     The Disclosure Statement contains inadequate information to comply with 11 U.S.C. § 1125, and the Second Amended Plan, on its face, is not confirmable in light of its proposal that Mr. Davis retain his equity interest in the Debtor without adding "new value" to the Debtor. The Debtor should be permitted to file an amended disclosure statement which contains adequate information for parties to make an informed judgment about the plan and which addresses the deficiencies of the Second Amended Plan identified herein; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1.     The Disclosure Statement is not approved; and

2.     The Debtor shall have until June 25, 2018 to file an amended disclosure statement consistent with this Order.

END OF DOCUMENT